O’NIELL, C. J.
The defendant has appealed from a judgment for damages for the death of plaintiff’s daughter. She was asphyxiated by gas escaping from a pipe that was left open in the house where she was employed, and it is contended that the escaping of the gas was the result of negligence on the part of the plumbers employed by the defendant gas company. The case was tried by a jury, whose verdict allowed $5,000 for the mother’s mental suffering, etc., and $167.-50 for the expense of the girl’s funeral. Answering the appeal, plaintiff asks for an increase of the judgment.
There is no dispute about the important facts of the case. The defendant, Baton Rouge Electric Company, is also the gas' company. Plaintiff’s daughter, Isabel Kent, a colored girl, 17% years old, was employed as nurse for a 3 year old child of Mr. and Mrs. Hebert. The Heberts and Mr. and Mrs. Si-card occupied the same apartment as tenants. They had moved into the apartment in August. It had been vacant since the latter part of June. When the tenant then moved out, the gas company’s plumber disconnected the gas pipe from the stove in the kitchen, and cut off the gas at the meter. He did not plug or cap the end of the gas pipe on the kitchen wall, but left it open, all of which was in accord with the custom of the company. The open pipe extended only a few inches from the wall, not far above the floor, and turned downward and extended to a point about 6 inches from the floor. When the Heberts and Sicards moved into the apartment, they placed a kitchen cabinet in front of the unused gas pipe. They used an oil stove for cooking, and did not use or need gas for any purpose until winter came. The apartment was equipped with gas radiators. On the 18th of November, at the request of the Heberts or Sicards, the defendant gas company turned on the gas at the meter in the apartment. When the plumber and his helper came, between 9 and 10 o’clock in the forenoon, the only persons in the apartment were the Hebert child and his nurse, Isabel Kent. She admitted the men and then called Mrs. Sicard, who was employed in the neighborhood. She showed the plumber where the meter was. He testified that,' before turning on the gas, he asked whether there was a gas stove in the apartment, and was told that there was none. He testified that he first asked the colored girl, and then asked Mrs. Sicard, and that, even though they both told him that the kitchen stove was an oil stove, he “didn’t take their word for it, but went into the kitchen, and looked around, and didn’t find any sign of a pipe in the kitchen.” Mrs. Sicard, as a witness in the case, denied that the plumber had inquired about a gas stove.
[1] Whether the plumber did or did not inquire about a gas stove, or go into the kitchen to see if there was an open gas pipe, before turning on the gas at the meter, is not important. He knew that it was the custom of the company, in disconnecting a service pipe from a gas stove, to leave the projecting pipe in the kitchen open, not plugged or capped, and he knew, or ought to have known, that a gas pipe in that condition, projecting from the kitchen wall, and not in use, might as likely be found behind a kitchen cabinet as anywhere else on the wall. Therefore, if he *145 did go into the kitchen to assure himself that there was not an open gas pipe, when he had been twice told that there was no gas stove in the kitchen, it was negligence on his part not to look behind the kitchen, furniture for the disconnected pipe.
When the plumber had turned on the gas at the meter, he examined the radiators and made sure that the taps were closed tight. Mrs. Sicard asked him to light one of the radiators, and he had some difficulty in lighting it. Believing there was only air in the pipe, he disconnected it at the union, and, observing that gas came out he connected it again, and then the radiator burned all right. Thereafter Mrs. Sicard smelled gas, and told the plumber so, and he replied that the odor was not that of escaping gas, but was due to the fact that the radiators were new.
The plumber admitted, in his testimony, that the gas meter had a dial on it, which, if he had watched it for a little while after turning on the gas and shutting off the radiators, would have told that the gas was escaping somewhere. He said that that was one of the purposes of the dial or indicator, which, unlike the meter-reading apparatus, responded quickly and indicated almost immediately whether gas was going through the meter. Our opinion is that it was negligence on the plumber’s part not to find out whether gas was going through the meter, with the radiators shut off.
The plumber and his helper left the apartment immediately after turning on the gas, and Mrs. Sicard then returned to her place of employment. The only persons left in the apartment were the child and the nurse.
Within an hour, Mrs. Hebert came to the apartment and remained 10 or 15 minutes, amusing her child. She smelled the escaping gas, and asked Isabel Kent about it. The latter replied that the plumber had told Mrs. Sicard that the odor' came from the new radiators, and was not gas. Mrs. Hebert then examined the radiators to make sure that none was leaking, and, admonishing the girl .to keep the doors and windows closed — for it was a very cool day — she left the apartment.
About an hour later — that is, near 11 o’clock' — a restaurateur, whose kitchen, on the ground floor, adjoined the building, in which the Heberts and Sicards had the upstairs apartment, smelled gas escaping. He immediately notified the defendant company by telephone, but no one came to attend to the matter. Later, the restaurateur sent a messenger to the company’s office, asking again for an investigation of the odor of gas in his kitchen; but the company paid no attention to the request. At 12:30, the cashier in the restaurant telephoned to the defendant’s office again.for an investigation of the escaping gas; but no one came to see about it. At 1 o’clock, Mrs. Sicard returned to the apartment, and, being unable to arouse the inmates, she summoned her husband, and he broke into the place. The Hebert child was found lying on the floor under a bedj and the nurse was on a window seat, at a closed window. Both were dead — asphyxiated by the gas escaping from the pipe in the kitchen.
The coroner was summoned and came immediately. The inquest resulted in a verdict in accord with the facts which we have stated; that is, that the deaths were caused, accidentally, by asphyxiation by gas escaping from an uncapped pipe in, the kitchen of the apartment. As we said at the beginning of this opinion, it is not now disputed that the deaths were caused by the gas which the defendant company’s employees, unintentionally, allowed to escape from the unused pipe in the kitchen of the apartment. Mr. and Mrs. Hebert were allowed damages for the death of their child. See Hebert et ux. v. Baton Rouge Electric Co., 150 La. 957, 91 South. 406. Although the affirmance of the judgment (reduced from $7,500 to $5,000) in that case was by only a division composed of two *148 members of this court and a judge called in from the Court of Appeal, the defendant did not ask for a rehearing.
[2] The attorneys'for appellant argue that it was not negligence on the part of the plumber, who disconnected the former tenant’s gas stove, to leave the gas pipe uncapped and unplugged, because, at the same time, the plumber cut off the gas at the meter and no harm could possibly have come from the open pipe so long as the gas remained cut off at the meter. In support of the proposition, appellant’s attorneys cite State v. Consolidated Gas Co., 85 Md. 637, 37 Atl. 263, and Consolidated Gas Co. v. Getty, 96 Md. 683, 54 Atl. 660, 94 Am. St. Rep. 603. It is argued that, even though the neglect to cap or plug the gas pipe, when it was disconnected from the stove, was a contributing cause of the fatal accident, it was only a remote cause; the direct or proximate cause being the subsequent act of turning on the gas at the rpeter. And it is argued that the plumber, who turned on the gas at the meter, was not guilty of negligence in failing to observe that there was an open gas pipe in the kitchen, because, say appellant’s attorneys, the plumber did all that a reasonable man could be expected to do to find out whether there was an open gas pipe in the kitchen. The question whether the first plumber’s neglect to plug or cap the end of the gas pipe in the kitchen was of itself actionable ■ negligence would be an important one, if the defendant in this case was not answerable for negligence on the' part of the plumber who afterwards turned on the gas at the meter, as well as for negligence on the part of the plumber who had disconnected the gas pipe from the kitchen stove. But what difference can it make in this case, where the defendant is answerable for negligence on the part of either plumber, which act was the proximate and which the remote cause of the fatal áccident — the leaving of the gas pipe open in the kitchen, or the turning on of the gas at the meter? About as much difference, we should say, as the satirist found ’twixt the two tweedles. The turning on of the gas at the meter, of course, was not an act of negligence. The negligence was the omission to plug or cap the unused pipe in the kitchen when the gas was turned off, or before it was turned on at the meter. It could hardly be argued — and in fact it is not argued — that the plumber who turned on the gas at the meter had a right to assume that, if there was a disconnected pipe in the kitchen, it would be already plugged or capped. Mrs. Sicard’s denial that the plumber' asked her whether there was a gas stove in the kitchen is not irreconcilable with his having looked in the kitchen for either a gas stove or an open pipe. Taking the plumber’s testimony for all it is worth, the purport of it is that he had in mind, when he was about to turn on the gas at the meter, the danger of there being an open gas pipe in the kitchen. Not only did he have in mind that there ought to be a service pipe in the kitchen, but he was informed that, if there was one, it was not connected with a gas stove. Having testified about his inquiry of the colored girl and of Mrs. Sicard about a gas stove in the kitchen, he said:
“Well, they told me there wasn’t any there, but I didn’t take their word for it, and I went into the kitchen and looked around, and I didn’t find any sign of a pipe in the kitchen. The only thing I saw was the oil stove.”
The import of the plumber’s statement was that he feared that, if a gas stove had been taken out of the kitchen, the service pipe on the wall might have been left open. Knowing that householders and servants were not familiar with such matters, it was quite natural that the plumber did not ask either Mrs. Sicard or the servant girl whether there was an open gas pipe in the kitchen, when they told him — if they did tell him — that there *149 was no gas stove in the kitchen. It was then his duty to go into the kitchen and plug or cap the service pipe, if there was one left open; and it was his duty to make a reasonable search for an unused gas pipe on the kitchen wall. 1-Ie did not discharge that duty by going into the kitchen and looking around only at the exposed places on the wall. He should have looked behind the kitchen cabinet, where the gas pipe was. Why, after being so determined to find a gas stove and to close its taps, should he have made no effort at all to.find the disconnected pipe on the wall?
It is not necessary to discuss the company’s neglect to give attention to the restaurateur’s complaint of the escaping gas. As appellant’s attorneys say, the evidence makes it very probable that enough gas had escaped to kill the inmates of the apartment before the gas found its way into the restaurant.
[3] Appellant’s attorneys argue that, if the judgment should not be reversed, the amount should be reduced to $2,500 (plus the funeral expenses), because, in the Hebert Case, both parents were allowed only $5,000. We do not regard the ruling on the amount of damages in that case as a precedent for this case. In the Hebert Case, there was no financial loss. The child was only 3 years old. The daughter of the plaintiff in this case, as we have said, was 17% years old, and the evidence is that she was already of some financial aid to her mother. She attended night school and was comparatively well advanced. Be that as it may, we cannot estimate grief and suffering in dollars and cents. In the assessment of such damages for offenses or quasi offenses, says article 1934 of the Civil Code, much discretion must be left to the judge or jury, and it is well settled that the article refers more particularly to the discretion of the trial judge than to that of the judges of appellate courts. See Groner v. Shreveport Railways Co., 144 La. 705, 81 South. 258. We do not see any reason why the judgment should be either increased or reduced.
The judgment is affirmed, at appellant’s cost.
BRUNOT, J., recused.